UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AUTOMOTIVE INTERIOR
INNOVATIONS, LLC, and
MICHAEL SANFORD,

      Plaintiffs,

v.

MATA AHSAP VE OTOMOTIV TIC SAN
AS d/b/a MATA AUTOMOTIVE

      Defendant.

Case No. 13-cv-12542
Honorable Laurie J. Michelson
Magistrate Judge Michael J. Hluchaniuk

---

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [41]**

---

This business dispute involves intertwined issues of mutual assent, statute of frauds, promissory estoppel, quantum meruit, and unjust enrichment. The trouble started in the spring of 2010. Defendant Mata AHSAP VE OTOMOTIV TIC SAN AS d/b/a Mata Automotive ("Mata"), an automotive parts distributor, was then interested in expanding its business in the United States and sought the aid of non-party Spectrum Industries, Inc. Spectrum assigned its sales agent, Plaintiff Michael Sanford, to work with Mata. By mid-2011, with Sanford's time on Mata matters increasing, Sanford and Mata engaged in negotiations for Sanford to work directly for Mata. Sanford made a detailed offer to Mata in December 2011; in it, Sanford sought a fixed monthly salary and sales commissions. Sanford says that Mata accepted his offer by saying it "look[ed] fine." Mata disagrees, saying that the parties did not intend to contractually bind themselves until they had executed a written contract—which the parties agree never happened. Sanford left Spectrum at the end of 2011 and formed Plaintiff Automotive Interior Innovations, LLC, which began invoicing Mata for sales work. Mata paid Automotive Interior the fixed

monthly salary set out in the December 2011 offer, but not the commissions. The parties' relationship eventually broke down, and Mata terminated Automotive Interior's services in April 2013. Automotive Interior then brought this lawsuit, primarily to recover the sales commissions it believes it is owed. Sanford subsequently joined as a plaintiff.

Before the Court is Mata's motion for summary judgment on all claims. (Dkt. 41.) For the reasons detailed below, the motion will be granted in part and denied in part.

## I.

Because Mata moves for summary judgment, the Court views the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-movants, Sanford and Automotive Interior. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## A.

Mata Automotive makes and distributes steering-wheel inserts and gear-shift knobs made of "carbon fiber and real wood veneer[]." (*See* Def.'s Mot. Ex. 1, Dec. 30, 2011 Spectrum-Mata Protocol; Sanford Dep. at 28–29.) Although it already had a substantial presence in Europe by the spring of 2010, Mata, located in Turkey, wanted to increase its sales to United States car manufacturers like General Motors and Ford. So Mata reached out to non-party Spectrum Industries, Inc., a supplier of decorative finishes located in Michigan. (*See* Bassett Dep. at 27–30; Sanford Dep. at 25.)

Sanford was employed (and paid) by Spectrum at that time, and Kevin Bassett, Spectrum's CEO, tasked Sanford with helping Mata develop its North American sales. (*See* Bassett Dep. at 29–30; Sanford Dep. at 23–25.) Sanford recalled, "[In the spring of 2010,] I called on Ford, I called on General Motors, I called on Chrysler, I called on Tesla, I had meetings

at Kia . . . ." (Sanford Dep. at 27.) Sanford said that these efforts resulted in Mata obtaining business from General Motors, Tesla, and Chrysler. (*Id.*)

In early 2011, Sanford and Erce Kaslioglu, Mata's founder and CEO, began discussing the possibility of Sanford working with Mata more directly. Sanford recalled, "[Erce and I] felt that the successes that we were having in gaining new business was going to require full-time attention, that I probably wouldn't be able to split Spectrum and the Mata workload, and so at a certain point in time, I would probably have to become a Mata sales rep direct without Spectrum." (Sanford Dep. at 42.)

In July 2011, Kaslioglu emailed Sanford the first of several offers exchanged between the two regarding Sanford working more directly for Mata. In this first offer, Kaslioglu described a scenario where Sanford would still work for Spectrum but Mata would pay Sanford $72,000 per year and give him "1% of Mata's [North American] sales which were created by [Sanford's] supporting efforts," excluding "[a]ny business that pre-date[d] [Sanford's] involvement." (*See* Pls.' Resp. Ex. D, July 20, 2011 Email from Kaslioglu to Sanford.)

Following further discussions, in September 2011, Kaslioglu sent Sanford another email with an "offer in a simple summary format" under the premise that Sanford would no longer work for Spectrum:

> • [For 2012:] Gross salary of 100,000 USD to be paid in 12 equal sums. [For 2013 and onwards: Gross salary of 115,000 USD to be paid in 12 equal sums.] This is to be invoiced to Mata every month by you.
>
> • 600 USD per month net car allowance.
>
> • Your approved business expenses such as flights, customer entertainments, hotel stays etc
>
> • 1% sales commission deriving from all [North America] sales created with your support. This is to be calculated and paid as a lump sum after the financial year ends.

(Def.'s Mot. Ex. 7, Sept. 30, 2011 Email from Kaslioglu to Sanford.)

About three weeks later, on October 24, 2011, Sanford sent a counteroffer. Sanford was "OK" with the business-expense coverage, but countered with a $115,000 in salary with three-weeks' vacation, and, in addition to the car allowance, fuel reimbursement. (Pls.' Resp. Ex. E, Oct. 24, 2011 Email from Sanford to Kaslioglu.) As to the fourth term of Kaslioglu's offer, Sanford wanted sales commissions of "1.5% paid quarterly, if paid late 2%/month charge will be applied to balance due." (*Id.*) Sanford wrote, "If we come to agreement on the numbers, I think we should look at a slightly more formal agreement as our official contract for the future." (*Id.*)

About a week later, on November 1, 2011, Kaslioglu emailed Sanford with an "updated offer." (Def.'s Mot. Ex. 8, Nov. 1, 2011 Email from Kaslioglu to Sanford.) Kaslioglu informed Sanford that he had met with Moiz Zilberman, Mata's Chairman of the Board, to discuss Sanford's proposal. (*Id.*) He wrote, "Below you can find our updated offer based on your latest requests. I believe that this now a good starting point to kick off our relationship in a formal way. Once I hear from you, I will get the formal agreement written asap." (*Id.*) The proposed terms:

- Gross salary of 115,000 USD to be paid in 12 equal sums. This is to be invoiced to Mata every month by you. You will also be entitled to 3 weeks holiday per calendar year.
- 600 USD per month net car allowance plus fuel allowance for Mata approved trips exceeding local "normal" daily driving.
- Your approved business expenses such as flights, customer entertainments, hotel stays etc
- 1% sales commission deriving from all NA component sales created with your support. This is to be calculated and paid as 6 monthly lump sums.

(Def.'s Mot. Ex. 8, Nov. 1, 2011 Email from Kaslioglu to Sanford.)

Following some negotiations by way of phone, on November 30, 2011, Kaslioglu emailed Sanford an updated offer. (Def.'s Mot. Ex. 8, Nov. 30, 2011 Email from Kaslioglu to Sanford.) Kaslioglu wrote: "[B]elow you can find the summary of our latest proposal as briefly discussed on the phone. If you are ok to move with this, then I will make the arrangement to

convert this into a proper contract and also commence the other arrangements with Kevin [Bassett]." (*Id.*) Three of the four terms were identical to those offered on November 1, 2011. But as to commissions, Kaslioglu sweetened the deal: "1% sales commission deriving from all [North American] sales value up to 2,000,000 USD created with your support. 1.5% sales commission deriving from all [North America] component sales value over and beyond 2,000,000 USD created with your support." (*Id.*)

By December 2011, Sanford was spending most of his time on Mata matters. Spectrum's CEO recalled, "[t]here was some activity that he was doing for Spectrum, but most of his time at this point was focused on Mata programs." (Bassett Dep. at 39.) On December 17, 2011, Bassett told Sanford to pick: Spectrum or Mata. (*See* Pls.' Resp. Ex. F, Dec. 17, 2011 Email from Sanford to Kaslioglu.)

So that day, Sanford emailed Kaslioglu: "Kevin [Bassett] has made it very clear today that I can no longer continue to represent Spectrum and Mata. I have to give him a decision on Monday (12/19) as to what company I am going to work for. If you and I can come to a basic agreement I would prefer to work with Mata however Spectrum offers great security and Kevin will renew my current contract." (Pls.' Resp. Ex. F, Dec. 17, 2011 Email from Sanford to Kaslioglu.) Sanford's email continued, "The following are the key terms that I would like to be included in our sales agreement. Once we reach agreement on these provisions, I will have my attorney prepare a formal contract for your review":

- My exclusive sales customers will be all North American and Transplant automotive original equipment manufacturers and tier suppliers located in North America.

- Mata shall pay me a commission of one and a half percent (1.5%) on any and all orders of Mata products that I secure.

- Commissions shall be based on the selling price of the products, which is the piece price as stated in the then current purchase order.

5

• Commissions shall be paid on or before the fifteenth (15th) day of the month following the month products are shipped to customers.

• Mata shall pay me a monthly retainer in the amount of $9,585 on the first day of each month.

• Mata shall reimburse me for my monthly cell phone service expense, all travel and customer entertainment related expenses and for travel and expenses to Mata's facilities as may be required from time to time. Expenses shall be paid no later than 30 days after submitted to Mata for reimbursement[.]

• Mata shall pay me a car allowance of $600 per month that shall be paid the first of the month.

• Term of the agreement shall be 5 years; agreement automatically renews for successive three-year terms unless either side provides written notice 90 days prior to expiration of the current term of their intent to terminate[.]

• If the agreement is terminated for any reason by either party, Mata is obligated to continue to pay me commissions on all invoiced shipments of products on which I had been working, including actual purchase orders as well as proposals, and quotations, and any subsequent reorders or change of part number or a change in manufacturing methods or product dimensions if the end use is functionally the same, and regardless of the date any such products are actually shipped to customers.

• All payments under the agreement are to be made in U.S. dollars and deposited electronically into an account I specify.

• Mata shall pay an additional 1.5% per month late charge on all payments more than 30 days past due.

(Pls.' Resp. Ex. F, Dec. 17, 2011 Email from Sanford to Kaslioglu.) Sanford's December 17 email concluded, "Please let me know if you can agree in principle to the above terms by Monday and we can make the transition effective January 1, 2012. If you can't, I can still attend the meetings next week in a way transparent to the customers but as of January 1, 2012, I will no longer be able to support Mata." (*Id.*)

According to Sanford, Kaslioglu accepted this offer during a phone conversation two days later. In particular:

[SANFORD:] [O]n [December] 19th, I had a phone call with Erce and we had discussed some Chrysler testing requirements that were a big deal at the time . . . . And following that, I asked him if he had a chance to review my proposal that I had sent him on the 17th and he said he had.

6

Q. Did he say anything else about the proposal?

A. I asked him if he would agree to it or what he thought of it, and he said, "It looks fine and I'll have my brother write it up." And he went on to explain that his brother's an attorney and that it would cost less for his brother to write it up than for me to write up a formal contract.

Q. Did you discuss any specifics . . . in your December 17th proposal with Erce?

A. . . . . Erce said that my proposal looked fine and that he would have his brother, who is an attorney, write it up.

(Sanford Dep. at 76.) (Kaslioglu's brother was in fact Mata's counsel. (Kaslioglu Dep. at 125.))

In a December 29, 2011 letter, Bassett informed Sanford that because of the "recent activity" between Sanford and Mata, December 31 would be Sanford's last day at Spectrum. (Bassett Dep. at 40.)

## B.

Four days after his last at Spectrum, on January 4, 2012, Sanford formed Automotive Interior Innovations, LLC. Sanford formed the company because he "thought that this business with Mata was going to grow": "as Erce and I had talked previously, I would probably have to hire some people to assist in selling their product." (Sanford Dep. at 88.) Sanford was (and is) the sole member of Automotive Interior and the company has never employed anyone else. (Sanford Dep. at 89.)

Beginning in January 2012, the newly formed Automotive Interior (as opposed to Sanford individually) began invoicing Mata for expenses consistent with the terms of the December 17, 2011 email: the $9,585.00 monthly salary (which equates to $115,000 per year), the $600 car allowance, and gas and business expenses. (*See* Pls.' Resp. Ex. I, Aug. 20, 2012 Invoice (No. 7); Def.'s Mot. Ex. 11, Oct. 8, 2012 Invoice (No. 9).)

**C.**

About a month and half after forming Automotive Interior, on February 16, 2012, Sanford sent an email to Kaslioglu that read, "Attached is a sales agreement proposal that we have talked about. Please take a look at it and let me know if you think it will meet our needs." (Def.'s Mot. Ex. 10, Feb. 16, 2012 Email from Sanford to Kaslioglu.) The attached document, titled "Sales Representative Agreement," is a proposed agreement between Automotive Interior (as opposed to Sanford) and Mata. (Def.'s Mot. Ex. 10, Proposed Agreement.) Sanford had his attorney draft it and, in many respects, the document appears to formalize terms set out in Sanford's December 17, 2011 email. For example, the proposed agreement states, "Principal [Mata] agrees to pay Agent [Automotive Interior] a commission of one and one-half percent (1 1/2 %) on any and all orders of Products by customers within the Territory from Principal . . . ." (Proposed Agreement ¶ 3.1.) It also says, "On the first day of each month during the term of this Agreement, Principal agrees to pay Agent (a) a monthly retainer in the amount of [$9,585.00], (b) a car allowance in the amount of [$600], and (c) such additional car expenses that Agent may incur at Principal's request." (Proposed Agreement ¶ 3.2.) And the proposal provides, "In the event of termination or expiration of this Agreement, as provided above, commissions shall be paid to Agent, as provided under Section 3 hereof, on all invoiced shipments of Products, where such Products were either produced for the Customer prior to the effective date of termination or expiration of this Agreement or where the business regarding such Products was procured prior to the effective date of termination or expiration of this Agreement." (Proposed Agreement ¶ 4.2.)

At his deposition, Sanford explained he sent Kaslioglu the proposed agreement "because [Erce] said he was going to send me a formal agreement when we agreed on this in December of

2011, and he never did, and I kept asking about them and he kept making excuses that his brother was too busy and that his brother was working on other contracts with suppliers and hasn't got to my contract yet." (Sanford Dep. at 94.) Sanford continued, "[S]o I paid the money myself to have to have my attorney draft up this agreement and sent it to Erce." (*Id.* at 94.)

Although the timing is unclear, after receiving the "Sales Representative Agreement," Kaslioglu expressed his disagreement with its terms. Kaslioglu testified, "I recall in more than numerous conversations that this [proposal] is completely out of line of where we were heading; therefore, you know, it seems like there's a big miscommunication in there." (Kaslioglu Dep. at 125.) Kaslioglu's position was that he and Sanford had only reached agreement on "three points" (monthly compensation, car allowance, and business-related expenses), but that they had not reached agreement on the fourth: "the occurrence of the commissions, as well as, once secured, the payment of the commissions and the structure of it." (Kaslioglu Dep. at 126.)

### D.

In July 2012, Mata began fulfilling some of the orders that Sanford had secured. (Sanford Dep. at 101.) Apparently this triggered Sanford to send Kaslioglu an email along with the August 2012 invoice: "When the dust settles some, I would like to discuss how we are going to figure out the commissions schedule, do I invoice for this, does Mata send me the shipping summary, ??" (Def.'s Mot. Ex. 22, Sept. 4, 2012 Email from Sanford to Kaslioglu; Sanford Dep. at 99–101.)

Sanford recalled that not long after his September 4, 2012 email,

[Erce] called me and he says, "Hey, with all the business that you've sold for Mata, the good news is that we've had to build a new plant to support all the production in the new business, the bad news is it's cost a lot of money and we don't have any money to pay you your commissions that are due."

> [And I said,] "Erce, that's not a good thing. What do you want to do? What's your proposal?"
>
> "My proposal is"—this is Erce speaking—"that we're going to have to delay your commission payments and I will pay you the total sum in January."

(Sanford Dep. at 101–02 (paragraphing altered).) Sanford had visited the new plant and "could understand there would be a shortage of cash." (Sanford Dep. at 102.) He testified, "I guess being the nice guy that I am, I was understanding to that, not selfish, and said, 'Okay, I'll agree to that. You can delay the commissions that you owe me and pay me in January of '13.'" (Sanford Dep. at 102.)

### E.

But beginning in 2013, the parties' relationship began to sour. Mata did not pay Automotive Interior's December 2012 invoice. Kaslioglu explained: "from [January 2013] onwards, a very significant operation separation, linked with unbelievable amount of customer complaints, had started about [Sanford]." (Kaslioglu Dep. at 148.)

On February 13, 2013, Zilberman (Mata's Chairman of the Board) sent an email to Sanford. Zilberman began by stating, "Following our recent meetings and evaluation of our business relations through[]out the last 18 – 24 months, we concluded our position in terms of your contract. We know it has taken too long to finalize it however this is not mainly due to you but due to the work load of our lawyers, who has been working on many other contracts in parallel." (Def.'s Mot. Ex. 12, Feb. 13, 2013 Email from Zilberman to Sanford.) Zilberman then went on to explain that Sanford had been successful in some instances but not others, and, while that was normal, "especially in the case of GM, it has been very uncomfortable for all partners at Mata to hear your name being mentioned in several negative contexts in a repeating manner." (*Id.*) Zilberman also explained that the last 18 to 24 months had "allowed [Mata] to reconsider

10

[its] extended needs in the [North American] market" and noted that it "is clear now that a significantly bigger existence is required in [North America] to be able to support all customers especially if we will be going after major contracts." (*Id.*) Zilberman's email concluded as follows:

> Now with all above comments, we would like to share with you our position with you regarding your contract. Upon receiving your positive comments, we will get the paperwork completed and send to you for signature.
>
> On top of the current monthly consultancy salary and expenses, we will offer a sales commission of 1.5% on Chrysler component sales and 0.5% on GM component sales. If and when more OEMs are added like Ford and others, we will evaluate your degree of involvement and assign a specific percentage to every new customer. On the other hand we need to advise you of a cap that with Chrysler and GM, the total amount of annual earnings, including the monthly consultancy can not exceed 300[,]000 USD per annum. When and if more customers will be added, this cap will be reviewed and increased accordingly. . . .
>
> Upon hearing from you, we will get on with detailing the above principles in the contract.

(Def.'s Mot. Ex. 12, Feb. 13, 2013 Email from Zilberman to Sanford.)

Sanford planned to reply to Zilberman by email, and so he sent a draft to Kaslioglu for review. Sanford's proposed email to Zilberman stated in part, "For the past year and a half I have been working with Mata under a hand shake agreement with Erce for a monthly consultancy salary and a negotiated sales commission of 1.5%." (Def.'s Mot. Ex. 13, Feb. 27, 2013 Email from Sanford to Kaslioglu.) Kaslioglu responded to Sanford: "Moiz [Zilberman] will be in New York within a few days. I believe that you need to meet up with him and talk face to face. I do not recommend trying to resolve the issue on e-mails." (Def.'s Mot. Ex. 13, Feb. 27, 2013 Email from Kaslioglu to Sanford.)

Sanford did not meet Zilberman in New York as planned because the airline cancelled his flight. (Sanford Dep. at 143.) So on March 15, 2013, Sanford sent an email to Zilberman instead. In part, Sanford explained his position as follows:

11

> For the past year and a half, I have been working with Mata under a hand shake agreement with Erce for a monthly consultancy salary and expenses and a negotiated sales commission of 1.5%. The commission includes the companies mentioned above and the Tier's (JCI, Lear, TRW, Fischer, Mitchell).
>
> The commission was supposed to be paid to me last year on a monthly basis. However, at the request of Erce in August 2012, due to cash being tight at Mata, I agreed to wait until January 2013 to have the commission for 2012 paid in full and then continue on a monthly basis.

(Def.'s Mot. Ex. 12, Mar. 15, 2013 Email from Sanford to Zilberman.) Sanford further stated that while he thought "the current agreement that [he had] with Erce and Mata (and have submitted in writing over a year ago) [was] very fair and competitive," he was agreeable to a "1% commission rate with GM" and "the cap for the Chrysler and GM accounts." (*Id.*) Sanford concluded, "I would like for the contract to be agreed upon in the near future and I would expect the past due commissions for the customers shown above (Chrysler, Tesla, SL America, Lear, JCI, GM, Fischer and Mitchell) to be paid by the end of this month since they are already seriously past due." (*Id.*)

On or around April 6, 2013, Sanford learned from a customer that Mata had terminated Sanford's services. (Sanford Dep. at 145–49.) That same day, Kaslioglu emailed Sanford. The email read in part, "As a result of our reviews, it has been decided that Mata Automotive will no longer work with your company due to the fact that provided service not meeting customers' and Mata expectations." (Def.'s Mot. Ex. 14, Apr. 6, 2013 Email from Kaslioglu to Sanford.) The email further informed that Mata had revoked Zilberman's February 13, 2013 offer and was "ending all business relationship with your company with immediate effect." (*Id.*)

## F.

About two months later, in June 2013, Automotive Interior filed this lawsuit against Mata. The Court subsequently granted Automotive Interior leave to add Sanford as a plaintiff.

(Dkt. 27, June 6, 2014 Order Granting Mot. for Leave to File 2d Am. Compl.; *see also* Dkt. 31, Mot. for Leave to File 2d Am. Compl. Hr'g Tr.)

Plaintiffs' Second Amended Complaint sets out six counts, all rooted in state law. Count I asserts breach of contract: Plaintiffs say that Sanford and Mata agreed to a contract in December 2011, that Automotive Interior was subsequently assigned Sanford's contractual rights and obligations, that the work that Sanford or Automotive Interior secured for Mata "will generate sales in the amount of approximately $18 million per year commencing in 2012 and continuing for several years thereafter," and that Mata is in breach of the December 2011 agreement for not paying the commissions on those sales. (2d Am. Compl. ¶¶ 6–8, 10.) Count II is based on the doctrine of quantum meruit: Plaintiffs say that Mata has failed to compensate them despite accepting their services under circumstances indicating to Mata that they expected to be paid for their services. (2d Am. Comp. ¶¶ 11–16.) Count III has similar allegations but is based on the doctrine of unjust enrichment. (*Id.* ¶¶ 17–22.) Count IV is brought by Sanford only and is premised on the doctrine of promissory estoppel—Sanford says he reasonably relied on Mata's promise to pay commissions when he left Spectrum. (*Id.* ¶¶ 23–27.) Count V asks this Court to declare that Mata "is liable to Plaintiffs for continuing post-termination sales commissions for the life of the product for all parts and programs worked on or secured by Plaintiffs, together with costs, interest and attorney fees so wrongfully incurred." (*Id.* at 9.) Finally, in Count VI, Plaintiffs assert a violation of Michigan's Sales Representatives' Commission Act, which permits not only recovery for damages but also attorneys' fees. (*See id.* at 10.)

Mata has moved for summary judgment on all six counts. (Dkt. 41, Def.'s Br. in Support of Mot. for Summ. J. ("Mot.").)

## II.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III.

### A.

Before addressing Sanford and Automotive Interior's six claims individually, Mata makes a threshold argument: "Sanford has no basis to sue in his individual capacity." (Def.'s Reply at 1; *see also* Def.'s Mot. at 14–16.) The Court agrees in part.

Mata argues that Sanford's own deposition testimony shows that he was "never a proper party to his lawsuit." (Def.'s Mot. at 14.) Mata references two of Sanford's statements: (1) "Automotive Interior is the plaintiff in this lawsuit" and (2) "[t]he parties to the agreement are Automotive Interior and Mata." (Sanford Dep. at 95, 150; *see also* Def.'s Mot. at 14.) As to the first statement, at the time of Sanford's deposition, he was not yet a party to this action. (*See* Dkt. 29, 2d Am. Compl. (filed June 6, 2014); Sanford Dep. (taken Feb. 26, 2014).) So Sanford testified exactly as he should have—Automotive Interior was then "the" plaintiff. Sanford's remark thus does nothing to show that he has no claims in this case.

The first statement is also better understood in context—but this time, context helps Mata. Sanford's testimony that the "parties to the agreement are Automotive Interior and Mata," refers to the February 2012 attorney-prepared proposed agreement. (*See* Sanford Dep. at 95.) And, as Sanford testified, the parties to that proposed agreement are Automotive Interior and Mata. (Def.'s Mot. Ex. 10, Proposed Agreement at 1.) This indicates that in February 2012, Sanford thought that there was a contract for commissions between *Automotive Interior* and

14

Mata. While this does not show that Sanford is not a proper plaintiff in this *case*, it indicates that the proper parties to the breach-of-contract claim must be Automotive Interior and Mata only.

Indeed, Plaintiffs' breach-of-contract theory requires this to be so. Plaintiffs maintain that Kaslioglu orally accepted Sanford's December 17, 2011 offer, and, after Sanford formed Automotive Interior in January 2012, it "was understood and agreed by the parties that all rights, duties, and obligations of Plaintiff Michael Sanford under the sales representation agreement were assigned to and/or assumed by Plaintiff Automotive Interior Innovations, LLC after its formation." (2d Am. Compl. ¶¶ 6, 7; Pls.' Resp. at 7–8.) If Plaintiffs prove correct, it means that when Mata subsequently failed to pay commissions allegedly due under the agreement, Mata breached no agreement between *Sanford* and Mata. So the Court agrees with Mata that Sanford is not the proper plaintiff to Count I, the breach-of-contract claim. *See Clark v. Dalman*, 150 N.W.2d 755, 759 (Mich. 1967) ("Since the plaintiff was not a party to the contract in any sense of the term, he cannot enforce an obligation created by it.").

It follows that Sanford is not a proper plaintiff to Count VI, a claim under Michigan's Sales Representatives' Commission Act. The Act provides that "[a] principal who fails to comply with [its provisions] is liable to the *sales representative* for . . . ", Mich. Comp. Laws § 600.2961(5) (emphasis added), and then defines a "sales representative" as "a person *who contracts with or is employed by a principal* for the solicitation of orders or sale of goods and is paid, in whole or in part, by commission," Mich. Comp. Laws § 600.2961(1)(e) (emphasis added). Because Sanford assigned all of his contractual rights to Automotive Interior, the "sales representative" was Automotive Interior, not Sanford. And it is not alleged that Mata ever "employed" Sanford. Sanford thus has no claim under the Sales Representatives' Commission Act.

15

The Court also agrees with Mata that the record conclusively establishes that "Sanford never rendered services to Mata as an individual" (Def.'s Mot. at 15), which means Sanford cannot bring claims under quantum meruit or unjust enrichment (Counts II and III). Prior to January 2012, Sanford worked for Spectrum. True, Sanford worked on securing business for Mata, but, until December 31, 2011, he was employed by Spectrum, received no compensation from Mata, and Mata paid Spectrum for the services Spectrum (through Sanford) provided. (*See* Bassett Dep. at 40–43.) Then, on January 4, 2012, Sanford formed Automotive Interior. Under Plaintiffs' own theory of the case, Sanford assigned to Automotive Interior all his rights in the parties' contract. Indeed, it was Automotive Interior that invoiced Mata, not Sanford. (*See* Pls.' Resp. Ex. I, Aug. 20, 2012 Invoice (No. 7); Def.'s Mot. Ex. 11, Oct. 8, 2012 Invoice (No. 9).) As such, the Court agrees with Mata that no reasonable jury could find that Sanford has claims in his individual capacity for quantum meruit or unjust enrichment—if any benefit was unfairly retained by Mata, Automotive Interior, not Sanford, provided it. *See Morris Pumps v. Centerline Piping, Inc.*, 729 N.W.2d 898, 904 (Mich. Ct. App. 2006) ("[I]n order to sustain a claim of quantum meruit or unjust enrichment, a plaintiff must establish (1) the receipt of a benefit by the defendant *from the plaintiff* . . . ." (emphasis added)).

The Court disagrees with Mata, however, that Sanford is not a proper plaintiff to the promissory-estoppel claim, Count IV. Sanford alleges that promises made by Kaslioglu induced him into leaving his well-paying and secure job at Spectrum. This claim does not turn on which entity (Sanford or Automotive Interior) provided a benefit to Mata, but instead on which gave something up based on Mata's promises. *See State Bank of Standish v. Curry*, 500 N.W.2d 104, 107 (Mich. 1993) (providing that a claim of promissory estoppel involves "'[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the

*promisee* . . . and which does induce such action or forbearance'" (emphasis added) (quoting Restatement (Second) Contracts § 90)); *accord Klein v. HP Pelzer Auto. Sys., Inc.*, 854 N.W.2d 521, 530 (Mich. Ct. App. 2014). Therefore, Sanford is a proper plaintiff to bring a promissory estoppel claim.

It follows that Sanford is also a proper plaintiff to Count V: whether Plaintiffs are entitled to "continuing post-termination sales commissions for the life of the product for all parts and programs worked on or secured by Plaintiffs" (2d Am. Compl. at 9) is essentially a component of Sanford's promissory estoppel claim. It is essential to both the scope of the promise and the damages elements of that claim. *See State Bank of Standish*, 500 N.W.2d at 107 ("'The remedy granted for breach [of a promise] may be limited as justice requires.'" (quoting Restatement (Second) Contracts § 90)); *Klein*, 854 N.W.2d at 530 (providing that "[t]he elements of promissory estoppel" include that the promise produced reliance "in circumstances such that the promise must be enforced if injustice is to be avoided").

In sum, Sanford has no cause of action against Mata for breach of contract (Count I), quantum meruit (Count II), or unjust enrichment (Count III), or under Michigan's Sales Representatives' Commission Act (Count VI). Sanford is a proper plaintiff to the promissory estoppel claim (Count IV) and the declaratory judgment claim (Count V).

**B.**

Mata seeks summary judgment on Count I, Automotive Interior's breach-of-contract claim, in two ways. First, Mata argues that no reasonable jury could find mutual assent. In the alternative, Mata argues that the statute of frauds bars Automotive Interior's contract count. The Court disagrees.

17

**1.**

Mata contends that the words Kaslioglu used to respond to Sanford's question about the December 17, 2011 offer—"looks fine"—do not manifest assent. (*See* Def.'s Mot. at 16.) But Mata's primary argument that there was no mutual assent focuses on the legal principal "that no oral contract is formed where the parties objectively manifest an intent to confirm the contractual terms in writing, as was the case here." (Def.'s Mot. at 16.) The Court agrees with Mata's statement of the law but disagrees with its application of it.

Under Michigan law, "'[i]f the parties indicate that the expected document is to be a mere "memorial" of operative facts already existing, its nonexistence does not prevent those facts from having their normal legal operation. . . . If the parties indicate that the [e]xpected document is to be the exclusive operative consummation of the negotiation, their preceding communications will not be operative as offer or acceptance.'" *Michigan Broad. Co. v. Shawd*, 90 N.W.2d 451, 453 (Mich. 1958) (quoting Restatement (First) of Contracts § 26 cmt. (b) (1932)); *see also Adolph v. Cookware Co. of Am.*, 278 N.W. 687, 689 (Mich. 1938) ("It is manifest, under plaintiff's testimony, that the parties contemplated, at least, a written memorial of their agreement, but, unless they intended such a writing to constitute a condition precedent to the taking effect of the alleged oral agreement, then their negotiations, if carried to the point of mutual accord, could constitute a valid present contract, and especially so when performance was entered upon and might not extend beyond a year."). Whether the parties have manifested an intent not to agree absent a written contract is a question of fact, *Adolph*, 278 N.W. at 689, and "'must be determined largely by oral testimony, or by preliminary or only partially complete writings,'" *Shawd*, 90 N.W.2d at 453 (quoting Restatement (First) of Contracts § 26 cmt. (b)). "[I]n most cases the question is properly left to the jury." *Opdyke Inv. Co. v. Norris Grain Co.*,

320 N.W.2d 836, 838 (Mich. 1982). Thus, to obtain summary judgment, Mata must show that on the record before the Court, every reasonable jury would find that Mata and Sanford intended that only a written contract would consummate their agreement.

Mata has not carried this burden. The Court starts with the pre-December 17, 2011 communications between Sanford and Kaslioglu. In his October 2011 offer to Kaslioglu, Sanford wrote, "If we come to agreement on the numbers, I think we should look at a slightly more formal agreement as our official contract for the future." (Pls.' Resp. Ex. E, Oct. 24, 2011 Email from Sanford to Kaslioglu.) And in responding with a counteroffer Kaslioglu stated, "Once I hear from you, I will get the formal agreement written asap." (Def.'s Mot. Ex. 8, Nov. 1, 2011 Email from Kaslioglu to Sanford.) And, later in November 2011, Kaslioglu similarly stated, "[B]elow you can find the summary of our latest proposal . . . . If you are ok to move with this, then I will make the arrangement to convert this into a proper contract[.]" All of this surely shows that the parties contemplated a written agreement in the end. And that fact supports Mata's position. *See Michigan Broad. Co. v. Shawd*, 90 N.W.2d 451, 453 (Mich. 1958) ("If a written draft is proposed, suggested, or referred to during the negotiations, it is some evidence that the parties intended it to be the final closing of the contract." (internal quotation marks omitted)). But the statements "[i]f we come to agreement" and "*[i]f you are ok* to move with this" indicate that the parties wanted to reach an agreement before formalizing it. At a minimum, it would not be unreasonable for a jury to interpret those statements that way.

Next, the Court examines Sanford's December 17, 2011 offer. The following emphasized language is key: "The following are the *key terms* that I would like to be included in our sales agreement. *Once we reach agreement on these provisions*, I will have my attorney prepare a formal contract for your review." (Pls.' Resp. Ex. F, Dec. 17, 2011 Email from Sanford to

Kaslioglu (emphasis added).) Sanford also asked Kaslioglu to "let me know *if you can agree in principle* to the above terms by Monday and we can make the transition effective January 1, 2012." (*Id.* (emphasis added).) As before, a jury could think that while the parties certainly wanted a written agreement in the end, they wanted to reach an agreement on all essential terms first.

This possibility is strengthened by both the context of Sanford's offer and its level of detail. As Sanford told Kaslioglu, Spectrum was demanding a decision—stay or go—within two days. Sanford also told Kaslioglu, "Spectrum offers great security and [Bassett] will renew my current contract," but "[i]f you and I can *come to a basic agreement* I would prefer to work with Mata[.]" (Dec. 17, 2011 Email from Sanford to Kaslioglu (emphasis added).) From this, a reasonable jury could find that Kaslioglu understood (or should have) that Sanford needed an agreement with Mata to leave Spectrum.

As for the content of Sanford's offer, it is markedly more detailed than prior offers by Kaslioglu or Sanford. It includes terms pertaining to when commissions would be paid, when the contract would expire, and how commissions would be paid if a party terminated the contract. Indeed, Sanford testified that his December 2011 offer was based off a contract he had received from a friend. (Sanford Dep. at 66–68.) A reasonable jury could infer that Sanford had intended to set forth all the essential terms of an agreement, thereby requiring only Kaslioglu's assent in order to bind Mata. *See Fisk v. Fisk*, 44 N.W.2d 184, 185 (Mich. 1950) ("A meeting of the minds upon all essential points is necessary to cons[t]itute a valid contract." (internal quotation marks omitted)). And a jury could think that Kaslioglu, recognizing that the offer was more detailed than prior ones, would have considered his response carefully. Under these inferences, any

forthcoming attorney-drafted agreement would merely be formalizing what had already been agreed to and not a condition precedent to having an agreement.

Mata makes much of what occurred after December 2011, but none of those events would preclude a reasonable jury from thinking that the parties had already reached agreement on sales commissions. Mata points out that in February 2012, Sanford sent Kaslioglu an attorney-drafted proposed agreement. (Def.'s Mot. at 17.) And it is also true that Sanford said to Kaslioglu, "Please take a look at it and let me know if you think it will meet our needs." (Def.'s Mot. Ex. 10, Feb. 16, 2012 Email from Sanford to Kaslioglu.) But Sanford's request is ambiguous: Was he merely asking Kaslioglu to confirm that his attorney accurately captured their prior agreement? Or did Sanford think that an agreement on commissions had not yet been reached? Ambiguities such as these, when the record does not dictate an answer, should be left for a jury to resolve.

Moreover, although the February 2012 attorney-drafted proposal contains terms not found in Sanford's December 2011 email offer, Mata has not shown that every reasonable jury would find that the December 2011 offer lacked an essential term found in the February 2012 proposal. *See Fisk*, 44 N.W.2d at 185. Mata merely points out that Sanford's December 2011 offer states that Sanford would receive commissions on "secure[d]" orders whereas the February 2012 proposal could be interpreted as awarding commissions on those orders that Automotive Interior "solicited." (*See* Def.'s Mot. at 8–9.) Yet, when all reasonable inferences are drawn in Sanford's favor, this difference cuts against Mata's position: this potential deviation from the parties' December 2011 agreement was why Sanford sought Kaslioglu's review of the February 2012 proposal. Moreover, Mata overlooks the fact that Sanford's December 2011 offer also states, "If the agreement is terminated for any reason by either party, Mata is obligated to

21

continue to pay me commissions on all invoiced shipments of products *on which I had been working*." This language could be consistent with the February 2012 proposal's use of the term "solicited." Questions such as these are best left for a jury.

Mata also points to the fact that in September 2012, Sanford asked Kaslioglu about the commissions. (Def.'s Mot. at 18.) But Sanford's query was not about the existence of commissions. Rather, it was about the "commissions schedule," i.e., would Sanford invoice or would "Mata send [him] the shipping summary"? (Def.'s Mot. Ex. 22, Sept. 4, 2011 Email from Sanford to Kaslioglu.) As for Mata's state of mind, Sanford recalled that not long after his September 4, 2012 question about the commissions schedule, Kaslioglu said, "we don't have any money to pay you your commissions *that are due*." (Sanford Dep. at 101–02 (emphasis added).) If a reasonable jury were to credit Sanford's testimony, it would be compelled to find that Kaslioglu was acknowledging that the parties had agreed to commissions.

Mata also draws the Court's attention to the fact that none of Automotive Interior's invoices included commissions. (Def.'s Mot. at 18–19.) But Sanford has explained why that was so: the commissions were due only after product shipped, and that did not happen until July 2012. Notably, in September 2012, while attaching the August 2012 invoice, Sanford asked Kaslioglu about the commissions schedule. Kaslioglu then requested, and Sanford agreed, that the commissions be deferred until 2013.

Mata also relies on Sanford's March 2013 email response to Zilberman to support its position. (Def.'s Mot. at 18.) Mata focuses on this statement by Sanford: "'I would like for the contract to be agreed upon in the near future . . . .'" (*See* Def.'s Mot. at 18 (quoting Def.'s Mot. Ex. 12 Mar. 15, 2013 Email from Sanford to Zilberman.)) Mata's partial quote misleads. Sanford's statement continued, ". . . and I would expect the past due commissions for the

22

customers shown above (Chrysler, Tesla, SL America, Lear, JCI, GM, Fischer and Mitchell) to be paid by the end of this month *since they are already seriously past due*." (Mar. 15, 2013 Email from Sanford to Zilberman (emphasis added).) Again, a reasonable jury could find that this was evidence the parties had already agreed to commissions, and that the contract "to be agreed upon in the near future" was merely the formal expression of an agreement in principle.

Finally, none of the four cases Mata cites persuade the Court that a reasonable jury could not find that Sanford and Mata had reached an agreement in December 2011 despite not having executed a written contract. Three are readily distinguishable. *Cf. Manon v. Corporate Solutions, LLC*, No. 04-73649, 2005 WL 3534765, at *6 (E.D. Mich. Dec. 23, 2005) ("In this case, the Letter of Intent expressly states that the parties do not intend to be legally bound 'until the execution and delivery of a mutually agreeable definitive purchase agreement.'"); *Michigan Broad. Co. v. Shawd*, 90 N.W.2d 451, 454–55 (Mich. 1958) (affirming lower court's verdict in favor of the defendant despite that the plaintiff offered proof that the defendant wanted his attorney to put into writing an agreement the parties had already reached where, after the defendant's attorney's draft agreement was sent for the plaintiff's review, the plaintiff made a counteroffer to purchase the physical assets of the defendant's company instead of the company's stock); *Angelo DiPonio Equip. Co. v. State, Dep't of State Highways & Transp.*, 309 N.W.2d 566, 568 (Mich. Ct. App. 1981) ("[T]he contract forms were sent to plaintiffs with a letter which cautioned that the furnishing of the contract forms did not constitute an award of the contract. . . . [T]he department expressly stated that the contract had not been awarded to plaintiffs when the contract forms were furnished to them for their completion.").

The fourth case is more analogous and thus deserves more discussion. In *Wirt v. Ticona Polymers, Inc.*, Gary Wirt (and his company, Quantum Technologies) sued Ticona Polymers

(and its predecessor) for failing to pay sales commissions. No. 04-73753, 2006 WL 2660607, at *1 (E.D. Mich. Sept. 14, 2006) *aff'd*, 243 F. App'x 155 (6th Cir. 2007). In May 1996, the parties signed a one-year agreement: Wirt would provide consulting services for Ticona and Ticona would pay Wirt a flat hourly rate. *Id.* at *1. In September 1998, the parties signed a written agreement retroactive to the expiration of the prior agreement (May 1997) and extending through March 1999; the payment term continued to be flat rate despite that Wirt had advocated "a different, commission-based compensation scheme." *Id.* at *2. The contract was retroactively extended twice more, both times via written addendums. *Id.* at *3. "Despite [Wirt's] continuing efforts throughout this time to obtain a commission-based compensation scheme, these addendums left the substantive terms of the parties' initial agreement unchanged, including the provision calling for [Wirt] to be paid at a flat hourly rate." *Id.* At the expiration of the thrice-extended written agreement at the end of March 2003, Wirt "drafted a proposed contract that entitled him to six percent of [Ticona's] 'gross resin sales revenue in the safety systems market'" and, upon termination, "'life of the part' commissions on sales he procured." *Id.* at *3. The evidence of what Ticona did in response to Wirt's proposal was mixed. Wirt was told by Ticona's director of marketing that "'[w]ithout any agreement, there would be no change' in his method of compensation" and told by Ticona's automotive market manager that "'the business unit and the legal department' would need to review any proposed agreement prior to its approval." *Id.* Further, although it was unknown to Wirt, Ticona was internally assessing the commissions-based scheme and considering whether to end its relationship with Wirt. *Id.* On the other hand, Wirt testified "that he was assured for 'weeks and months' by several members of [Ticona's] management that his proposed contract 'would be signed and returned to [him].'" *Id.*

at *3. And, relying on this allegation, Wirt argued that he had "secured an 'agreement to agree,' which, under Michigan law, 'may be just as valid as any other contract.'" *Id.* at *7.

Although the district court did not disagree with the rule of law Wirt relied upon, it found the rule inapplicable to the facts. The court explained, "the record of [Ticona's] internal deliberations defeats any claim that the company had accepted [Wirt's] proposal, with only the ministerial act of signing remaining to formalize the parties' meeting of the minds." *Wirt*, 2006 WL 2660607, at *8. According to the court, the record revealed "that [Ticona's] management was meeting in July and August of 2003 to discuss the terms of a contract proposal to [Wirt], several months *after* [Wirt] submitted his proposed contract to [Ticona]. Evidently, then, [Ticona] still viewed the terms of [Wirt's] contract as an open issue rather than a done deal." *Id.* As such, Wirt could not "establish a meeting of the minds as to his proposal that he be paid a six-percent commission on sales he procured in the safety systems market." *Id.*

Mata believes this case is just like *Wirt*: "as late as 2013, [Mata was] internally deliberating the terms of a potential commission arrangement with Automotive Interior." (Def.'s Mot. at 17; *see also* Def.'s Mot. at 18 (citing *Wirt*, 2006 U.S. Dist. LEXIS 69185, at *24–25).)

But Mata overlooks key factual differences between this case and *Wirt*. First, the history of Sanford and Kaslioglu's negotiations is very different than Wirt and Ticona's. Here, both sides contemplated commissions almost from the get-go. At least five months before December 2011, in July, Kaslioglu offered Sanford "1% of Mata's [North American] sales which were created by [Sanford's] supporting efforts." (Pls.' Resp. Ex. D, July 20, 2011 Email from Kaslioglu to Sanford.) Every offer and counteroffer from that point on included a term for commissions of at least 1%. Wirt, by contrast, repeatedly sought commissions but then, by executing a written agreement, settled for a flat rate. In other words, Ticona repeatedly refused to

assent to commissions while Kaslioglu repeatedly offered to pay them. Second, Mata's internal deliberations in this case occurred in a different context than Ticona's in *Wirt*. Taking the facts in the light most favorable to Sanford, Kaslioglu acknowledged that commissions were owed (and asked to defer payment of them to January 2013). It was only after this acknowledgment that Zilberman contacted Sanford, informing Sanford that Mata had recently concluded its position with respect to his contract. Ticona in *Wirt* never made a concession similar to Kaslioglu's.

In sum, Mata has not shown that every reasonable jury would find that the parties intended to be bound only upon execution of a written contract.

## 2.

Mata alternately asserts a statute of frauds defense. (*See* Def.'s Mot. at 19–20; Def.'s Reply at 2–3.) Mata correctly observes that, under Michigan law, an "agreement that, by its terms, is not to be performed within 1 year from the making of the agreement" is "void" unless it "is in writing and signed with an authorized signature by the party to be charged with the agreement." Mich. Comp. Laws § 566.132(1). Mata claims that this provision applies to the parties' agreement (if they reached one) because the December 2011 offer contemplated commissions for the life of the part and Sanford testified that "'the average time for a[n] [automotive part] program . . . would . . . be five to seven years.'" (Def.'s Mot. at 20 (quoting Sanford Dep. at 82).) Mata also points out that Sanford acknowledged that if a program is not canceled, it would "typically" last for more than a year. (Sanford Dep. at 82.)

Automotive Interior counters by asserting that "if there is 'any possibility' that the contract may be completed within one year, the contract does not come within the statute of frauds." (Pls.' Resp. at 20 (citing *Adolph v. Cookware Co. of Am.*, 278 N.W. 687 (Mich. 1938); *Drummey v. Henry*, 320 N.W.2d 309 (Mich. Ct. App. 1982)).) According to Automotive Interior,

"[a]lthough the automotive parts sales programs that Plaintiffs worked to secure were expected to remain in place for several years," a "customer could cancel the entire program" or "cancel the purchase orders issued to Mata[.]" (Pls.' Resp. at 21.)

The parties' focus on the duration of automotive-parts programs is misplaced. Sanford's December 2011 offer provides: "Term of the agreement shall be 5 years; agreement automatically renews for successive three-year terms unless either side provides written notice 90 days prior to expiration of the current term of their intent to terminate[.]" (Pls.' Resp. Ex. F, Dec. 17, 2011 Email from Sanford to Kaslioglu.) Apparently then, any contract was for a fixed term of not less than five years.[1] Under Michigan law, "[a] contract for a definite term has been generally regarded to be within the section of the statute of frauds concerning an 'agreement that, by its terms, is not to be performed within 1 year from the making thereof,' . . . ." *Toussaint v. Blue Cross & Blue Shield of Michigan*, 292 N.W.2d 880, 891 n.24 (Mich. 1980). Thus, the relevant question is whether the putative *agreement* could be "performed within 1 year from [its] making." And here it could not as the December 2011 offer contemplated Sanford providing services to Mata for no less than five years. *See e.g.*, *Marrero v. McDonnell Douglas Capital Corp.*, 505 N.W.2d 275, 278 (Mich. Ct. App. 1993) ("Plaintiff's own deposition testimony reflects that the alleged September 1987 contract was for a three-year term. 'By its terms,' then, the contract could not have been 'performed within one year' and so falls within the statute of frauds.").

That said, the Court does not ultimately decide whether the December 2011 agreement (to the extent that there is one) falls within Michigan Compiled Laws § 566.132(1)(a) as incapable of performance within a year of formation. This is because, as Automotive Interior

---

[1] Although not raised in Mata's briefing, it raised this issue during the oral argument.

argues, a reasonable jury could find that Mata is estopped from raising the statute of frauds as a defense. (*See* Pls.' Resp. at 21–22.)

Although the Michigan Court of Appeals has questioned the use of a judicial doctrine to bar a rule enacted by the State's legislature, as far as this Court can tell, a defendant may be estopped under Michigan law from raising a statute of frauds defense. *See Metro. Alloys Corp. v. Considar Metal Mktg., Inc.*, 615 F. Supp. 2d 589, 598 (E.D. Mich. 2009) (citing case law illustrating "the continued willingness of the Michigan courts to apply principles of estoppel to overcome a statute of frauds defense"); *Kelly-Stehney & Associates, Inc. v. MacDonald's Indus. Products, Inc.*, 658 N.W.2d 494, 499 (Mich. Ct. App. 2003) ("Although we question the propriety of applying the equitable estoppel doctrine and other common-law exceptions to the statute of frauds, we will continue to do so until our Supreme Court states otherwise."), *vacated on other grounds*, 469 Mich. 1046, 677 N.W.2d 838 (2004); *Clark v. Coats & Suits Unlimited*, 352 N.W.2d 349, 354 (Mich. Ct. App. 1984) ("It is well settled that promissory estoppel, if established, can be invoked to defeat the defense of the statute of frauds."). To successfully invoke estoppel, Automotive Interior must prove the following elements: "(1) a promise; (2) that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of the promisee; (3) which in fact produced reliance or forbearance of that nature; and (4) under such circumstances that the promise must be enforced if injustice is to be avoided." *Clark*, 352 N.W.2d at 354. As the case is at summary judgment, Automotive Interior needs only show that a reasonable jury could find these four elements satisfied. *See State Bank of Standish v. Curry*, 500 N.W.2d 104, 108 & n.6 (1993) (providing that "[t]he existence and scope of the promise are questions of fact" and that "'[t]he question of [the doctrine of estoppel's] application in any case is a mixed question of law and fact, and in cases of jury trial must be

submitted to the jury under proper instructions'" (quoting *Maxwell v. Bay City Bridge Co.*, 41 Mich. 453, 468, 2 N.W. 639 (Mich. 1879))).

Mata presents three reasons as to why a reasonable jury would not: (1) "Mata paid all promised amounts to Automotive Interior (i.e., the $115,000 salary, car allowance, and business expenses)," (2) Plaintiffs' reliance was unreasonable where "there was no meeting of the minds," and (3) there was no definite and clear promise. (Def.'s Reply at 4.) They do not persuade. As for Mata's first two points, as explained, whether there was a meeting of the minds on commissions is a question for the jury on this record. And, if there was, then Mata did not provide Sanford all that it promised. In support of its third point, Mata cites *Grand Connectivity, LLC. v. Centennial Communications Corp.*, 106 F. App'x 928, 929 (6th Cir. 2004); but the promise in that case was much more indefinite than the one here. *Grand Connectivity* involved an alleged oral agreement, allegedly consummated in the middle of a multi-day FCC auction, where the defendant, Centennial Communications, would take over the bids that the plaintiff, Grand Connectivity, had already made; the court thought the promise "too vague" because there was no ceiling on Grand Connectivity's bids and because Grand Connectivity was bidding on licenses that Centennial did not want. *Grand Connectivity, LLC. v. Centennial Commc'ns Corp.*, No. 01-73157, slip op. at 16–17 (E.D. Mich. Nov. 12, 2002). (The Court cites the district court opinion because the Sixth Circuit affirmed "for the reasons stated in the district court's order." 106 F. App'x at 929.) In contrast, the promise at issue here is much more detailed and clear. Sanford offered "a commission of one and a half percent (1.5%) on any and all orders of Mata products that [Sanford] secure[d]" to be paid "on or before the fifteenth (15th) day of the month following the month products are shipped to customers," and, in the event that "the agreement is terminated for any reason by either party, Mata [wa]s obligated to continue to pay [Sanford] commissions on all

29

invoiced shipments of products on which [Sanford] had been working . . . ." Sanford's December 2011 offer also included a host of other terms covering salary, business expenses, the term of agreement, a late charge on payments, and sales territory. With all of this at hand, and knowing that Sanford needed an agreement on these terms to leave a secure job at Spectrum, Kaslioglu said that the terms "look[ed] fine." That was definite enough—or, at least, a jury could think so. *See Lovely v. Dierkes*, 347 N.W.2d 752, 753 (Mich. Ct. App. 1984) ("Plaintiff here alleged a promise by defendants to employ plaintiff for three years at a salary of $400 per week, with an interest in defendant corporation, such interest to increase with each year of employment. This promise was definite and clear, as is required to support an estoppel.").[2] Indeed, as discussed, a jury could find mutual assent; this suffices to end the promissory estoppel inquiry too. *See State Bank of Standish v. Curry*, 500 N.W.2d 104, 109 (Mich. 1993) ("[I]t has been noted that considerable authority supports the proposition that maximizing the policy of contractual freedom requires that the tests for the validity of the coincident promissory estoppel promise and contract offer be the same." (internal quotation marks omitted)).

Mata has not carried its summary-judgment burden of demonstrating that no reasonable jury could find that it is estopped from asserting a statute of frauds defense.

---

[2] Mata has not argued that it did not "induce action of a definite and substantial character on the part of" Sanford. As such, the Court does not address *Lovely*'s statement that "plaintiff's termination of his [prior] employment . . . was insufficient alone to bar application of the statute of frauds[;] [s]ome additional reliance is necessary." 347 N.W.2d at 490. The Court notes, however, that under his agreement with Spectrum, Sanford was entitled to commissions (although he did not earn many) and $50,000 in life-insurance benefits. (Def.'s Mot. Ex. 6, Spectrum Employment Offer Letter to Sanford.)

* * *

In sum, a reasonable jury could find that the Sanford and Mata reached an agreement without executing a written contract. And a reasonable jury could find that Mata is estopped from raising the statute of frauds as a defense.

## C.

Mata's argument for summary judgment on Count VI, Automotive Interior's claim under Michigan's Sales Representatives Commission Act, is merely derivative of its breach-of-contract arguments. In particular, Mata says, "Because the undisputed facts show that Mata and Automotive Interior never reached a mutual agreement on sales commissions, Mata is entitled to judgment as a matter of law on Plaintiffs' breach of contract and Michigan Sales Representatives' Commission Act claims." (Def.'s Mot. at 19.)

Because the Court has rejected Mata's argument on the breach-of-contract claim, it follows that the same argument as to Automotive Interior's claim under Michigan's Sales Representatives' Commission Act also fails to warrant summary judgment.

## D.

Mata makes a number of underdeveloped arguments for summary judgment on Automotive Interior's quantum meruit and unjust-enrichment claims (Counts II and III, respectively), and on Sanford's promissory-estoppel claim (Count IV). (*See* Def.'s Mot. at 20–22; Def.'s Reply at 4 & n. 1.) Without saying much more, Mata asserts: (1) "[b]ecause Mata and Automotive Interior never reached a mutual agreement with respect to sales commissions, there could be no implied contract on this point"; (2) Sanford is not a proper party to this lawsuit and so his promissory-estoppel claim fails; (3) "no claim for unjust enrichment or quantum meruit

31

can lie because Mata already agreed to pay—and did pay—Automotive Interior a $115,000 salary as compensation for its services"; and (4) there can be no claim based on an implied-contract theory because "[t]he parties agree that there is an express contract[;] the dispute is as to whether that contract included an agreement for the payment of commissions." (*See* Def.'s Mot. at 20–22; Def.'s Reply at 4 & n. 1.)

The first three arguments do not require extended discussion. Two have been addressed: a reasonable jury could find mutual assent on the record before the Court; and it could find that Kaslioglu made a definite-enough promise that reasonably induced Sanford to leave his job at Spectrum. As for Mata's third argument, "in order to sustain a claim of quantum meruit or unjust enrichment, a plaintiff must establish (1) the receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to the plaintiff because of the retention of the benefit by the defendant." *Morris Pumps v. Centerline Piping, Inc.*, 729 N.W.2d 898, 904 (Mich. Ct. App. 2006); *see also Nat'l Concrete Const. Associates v. Walbridge Aldinger Co.*, No. 269482, 2006 WL 3103045, at *3 (Mich. Ct. App. Nov. 2, 2006) (noting that quantum meruit and unjust enrichment have the same elements). Mata apparently asserts that there was no "inequity resulting to" Automotive Interior or Sanford because it paid Automotive Interior $9,585 a month for its services (plus $600 for a car-allowance and additional money for business expenses). (*See* Def.'s Mot. at 21; Def.'s Reply at 4.) But Mata has not shown that every reasonable jury would find that the benefits it received from Automotive Interior's work were equitable even if it kept an extra 1.5% on orders owed to Automotive Interior. In other words, it does not necessarily follow that simply because Mata paid something for Automotive Interior's work, it paid a just amount. *See Karaus v. Bank of New York Mellon*, 831 N.W.2d 897, 905 (Mich. Ct. App. 2012)

("[T]he key to determining whether enrichment is unjust is determining whether a party unjustly received and retained an independent benefit.").

In this regard, the case Mata cites, *Kamalnath v. Mercy Memorial Hospital Corp.*, 487 N.W.2d 499 (1992), undermines its position. (*See* Def.'s Mot. at 21.) There, the plaintiff sought to recover under a contract and, alternatively, under quantum meruit. On the contract theory, the court found no mutual assent. *Id.* at 504. As to quantum meruit, the appellate court thought no recovery warranted because the defendant had paid the plaintiff consistent with the terms of their proposed contract:

> Because [plaintiff] *has* been compensated, she cannot seek recovery in quantum meruit. She was paid for her services at the clinic in 1986 and 1987 at the proposed contract rate of $60,000 a year. The doctrine of quantum meruit allows a party to recover the reasonable value of services rendered. A contract, though void under the statute of frauds, may be admissible to show the value placed on a plaintiff's services by the parties. . . . Plaintiff is not entitled to any additional payment under a quantum meruit analysis.

*Kamalnath*, 487 N.W.2d at 504. Indeed, "plaintiff herself admitted that she was paid appropriately." *Id.* at 505. Automotive Interior takes just the opposite position here. And, more importantly, the putative contract, "admissible to show the value placed on a plaintiff's services by the parties," includes commissions.

This does not mean, of course, that a court or jury may rewrite an agreement because it turns out to be an unfair bargain. And this leads to Mata's fourth argument for judgment on Automotive Interior's implied-contract claims: that there is no dispute that an agreement was reached (for salary, car allowance, and business expenses), that the only dispute is to a term of the agreement (commissions), and, under Michigan law, where the parties have reached an agreement, the law will not imply one. (Def.'s Mot. at 21; Def.'s Reply at 4 n.1.) Mata is right on the law: "[t]he law in [Michigan] seems to be well settled that where an express contract is

33

entered into between parties, but they differ as to the terms thereof, and there is evidence tending to support the claim of each of them, it is for the jury to determine what the terms of the contract were, and there can be no recovery on the quantum meruit." *Geistert v. Scheffler*, 25 N.W.2d 241, 242 (Mich. 1946).

But Mata's use of this rule is premature. As discussed at length, Mata argues that without an executed, written contract, the parties had no agreement; and, even if there was an agreement, it is void under the statute of frauds. Unless Mata is willing to forgo these two arguments, it is possible that a jury could be persuaded by them. And if the jury is, it would conclude that there was no express agreement. And without an express agreement, nothing precludes an implied one. Mata seeks to escape this logic through artful argument: there was an agreement—just not on commissions. But on this record it is not plausible that the parties required a written contract to agree to commissions but did not require one to agree on other key compensation terms—terms valued at over $10,000 per month. Indeed, every offer and counteroffer discussed salary, car allowance, business expenses, and commissions—all four, together. Likewise, it is not plausible that the statute of frauds would bar the commissions term, but not terms pertaining to salary, car allowance, and business expenses where Sanford's December 2011 offer included all those terms and stated, "Term of the *agreement* shall be 5 years; . . ." If a jury finds that the parties never had an agreement, or the agreement is void under the statute of frauds, Automotive Interior should be able to advance an implied-contract theory. *See Geistert v. Scheffler*, 25 N.W.2d 241, 243 (Mich. 1946) ("There is, however, another rule of law that allows recovery on a quantum meruit theory where the plaintiff has performed services under an express agreement which is not enforceable because of the statute of frauds or some other statute that prevents recovery on the terms of the agreement itself." (internal quotation marks omitted)); *H.J. Tucker & Associates, Inc. v. Allied*

34

*Chucker & Eng'g Co.*, 595 N.W.2d 176, 188 (Mich. Ct. App. 1999) ("[T]he trial court in the present case could have found that there was no contract between the parties . . . . In that case, any recovery by plaintiff would have been on an implied contract basis.").

Mata is not entitled to summary judgment on Automotive Interior's quantum-meruit and unjust-enrichment claims or Sanford's promissory-estoppel claim.

## E.

On Count V, Plaintiffs ask this Court to declare that Mata "is liable to Plaintiffs for continuing post-termination sales commissions for the life of the product for all parts and programs worked on or secured by Plaintiffs, together with costs, interest and attorney fees so wrongfully incurred." (2d Am. Compl. at 9.) Mata argues that whether under an implied- or express-contract theory, the record simply does not permit a reasonable jury to conclude that it owed "commissions on (a) business that Mata obtained before January 4, 2012; (b) business that Mata obtained after April 6, 2013; or (c) the Tesla Model X program." (Def.'s Mot. at 22.) The Court agrees.

The parties' arguments stress the text of Sanford's December 2011 offer. Highlighting the clause that says, "Mata shall pay me a commission of one and a half percent (1.5%) on any and all orders of Mata products that I secure," Mata argues, "The present tense of the proposal ('I secure') makes undeniably clear that Sanford was referring only to prospective sales he would have secured *after* finalizing an agreement with Mata. The proposal did not, for instance, include commissions on orders of Mata products that '*I have secured*.'" (Def.'s Mot. at 23.) Mata says that this means Plaintiffs are not entitled to commissions on business that Mata obtained before January 4, 2012. As for the other end of the timeline, Mata says that it does not owe "commissions for business that Mata secured after terminating Automotive Interior's services"

35

on April 6, 2013 because "Automotive Interior could not have 'secured' business for Mata after [Automotive Interior] stopped providing sales representation services." (Def.'s Mot. at 24.)

Plaintiffs direct the Court's attention to a different clause in the December 2011 offer: "If the agreement is terminated for any reason by either party, Mata is obligated to continue to pay me commissions on all invoiced shipments of products on which I had been working, including actual purchase orders as well as proposals, and quotations . . . ." Plaintiffs say that the phrase "on which I had been working" means that "it was the parties' intention that commissions would be paid on all of the business that Mr. Sanford or Automotive Interior worked on for Mata." (Pls.' Resp. at 19.) Plaintiffs "acknowledge[] that there appears to be a conflict" between the two commission provisions ("secured" and "on which I had been working") but that such conflicts must be submitted to the jury for resolution. (Pls.' Resp. at 17–18.)

As an initial matter, Plaintiffs overstate the law. True, the case they cite does say, "It is well settled that the meaning of an ambiguous contract is a question of fact that must be decided by the jury. . . . [W]here [a contract's] meaning is obscure and its construction depends upon other and extrinsic facts in connection with what is written, the question of interpretation should be submitted to the jury, under proper instructions." *Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 453–54 (Mich. 2003) (internal quotation marks omitted). (And it is true that this statement has been echoed in other decisions, including some from this District. *E.g.*, *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, No. 07-10341, 2007 WL 1343682, at *8 (E.D. Mich. May 8, 2007) rev'd, 511 F.3d 535 (6th Cir. 2007); *Volkswagen of Am., Inc. v. Am. Auto. Ass'n*, No. 05-60146, 2005 WL 3163386, at *2 (E.D. Mich. Nov. 28, 2005).) But this Court understands the statement from *Klapp* as standing for the unremarkable proposition that when a contract's terms are unambiguous, their meaning is question of law; but when a

36

contract's terms are ambiguous, their meaning a question of fact. *See In re Smith Trust*, 745 N.W.2d 754, 758 (Mich. 2008) ("If the contractual language is unambiguous, courts must interpret and enforce the contract as written, because an unambiguous contract reflects the parties' intent as a matter of law." (citations omitted)); *Klapp*, 663 N.W.2d at 454 ("Where a written contract is ambiguous, a factual question is presented as to the meaning of its provisions, requiring a factual determination as to the intent of the parties in entering the contract." (internal quotation marks omitted)). Thus, like all questions of fact, the meaning of a contract term may be decided by the Court on summary judgment where all reasonable juries would assign but one meaning. *See Lomree, Inc. v. Pan Gas Storage, LLC*, 499 F. App'x 417, 421 (6th Cir. 2012) ("Pan Gas points us to language in the Michigan cases to argue that all ambiguous contracts must automatically be interpreted by juries. . . . As with any case involving questions of fact, the existence of contractual ambiguities does not automatically preclude summary judgment if the evidence of intent is undisputed. . . .").

So this Court must answer this question: whether the relevant extrinsic evidence is "so one-sided as to make one party's interpretation unreasonable." *Lomree*, 499 F. App'x at 421. The answer is "yes."

As to the start of the commissions period, the December 2011 offer language and the associated extrinsic evidence conclusively show that Automotive Interior was only entitled to commissions for work Sanford performed after January 4, 2012. The language of the offer itself is forward looking. It says that Sanford's exclusive sales customers "will be" and also uses the present tense "I secure" when referring to commissions. Moreover, Plaintiffs have not explained how reading the commission term to include work that Sanford performed while at Spectrum is consistent with other terms in the December 17, 2011 email. For instance, would this mean that

37

Sanford would also have been entitled to the monthly retainer and car allowance when he worked on Mata matters while employed at Spectrum? And would it mean that the term of the agreement, five years, started when Sanford began working on Mata matters while at Spectrum?

As for the phrase, "on which I had been working," it does not change the future-looking nature of the offer. A more complete quotation reveals why: "*If the agreement is terminated for any reason by either party*, Mata is obligated to continue to pay me commissions on all invoiced shipments of products on which I had been working . . . ." In other words, the clause governs what happens if the agreement is, at some point in the future, terminated.

Turning to the extrinsic evidence, it is true that Sanford worked on securing programs for Mata before January 2012. But Sanford was then employed by Spectrum. So any work Sanford did for Mata was in fact for Spectrum. Indeed, the entire purpose of the parties' negotiations was for Sanford to stop working for Spectrum and start working directly with Mata. That is, the parties were attempting to structure their future relationship. *See Sobczak v. Kotwicki*, 347 Mich. 242, 249, 79 N.W.2d 471, 475 (1956) ("It is elementary that a contract must be construed so as to effectuate the intent of the parties when it was made; and, to ascertain the intent of the parties, a contract should be construed in the light of the circumstances existing at the time it was made." (internal quotation marks omitted)). Nothing in any of the negotiations is clear enough to rebut this inference. Plaintiffs rely on statements by Kaslioglu that Sanford would be paid "1% sales commission deriving from all NA component sales created *with your support*," but this offer was never accepted by the Plaintiffs and the context of that offer is the future: the other offered terms—a salary of $115,000, a car allowance, and business-expense coverage—are undoubtedly compensation that Sanford would be entitled to only after he left Spectrum. In short, a reasonable

jury could not find that Mata, which was compensating Spectrum for Sanford's services prior to January 2012, was negotiating with Sanford to pay Sanford for those very same services.

The record is also plain that Automotive Interior did not provide services to Mata after April 6, 2013. Thus, neither Sanford nor Automotive Interior could have "worked on" or "secured" any order or quotation after that date.

It appears that the parties also dispute what Sanford needed to do to obtain commissions under the termination clause: Plaintiffs imply that they are entitled to commissions so long as Sanford "work[ed] on" obtaining the programs, whereas Mata implies that Plaintiffs are only entitled to commissions (if any) for programs Plaintiffs "secure[d]." (*See* Pls.' Resp. at 17; Def.'s Mot. ¶ 25.) The dispute is moot. Mata says that there are only eight programs at issue in this case (Def.'s Mot. ¶ 34), Plaintiffs do not dispute this (Pls.' Resp. at 18–20), and each of those eight programs were "secure[d]" prior to Mata's termination of Automotive Interior's services (*see* Def.'s Mot. ¶ 34 (chart stating dates on which "Mata [Was] Awarded Business")). Thus, the Court need not decide whether Plaintiffs are entitled to commissions for programs that Sanford merely "work[ed] on" but did not "secure"—no such programs are at issue in this case.

Finally, Mata says it was not awarded the Tesla Model X program. (Def.'s Mot. at 12.) Plaintiffs have cited no evidence rebutting this. (*See* Pl.'s Resp. at 18–19.) Sanford merely testified that *if* the parts under the Tesla Model S program were also used in the Model X program, he would be entitled to commissions on the Model X shipments as well. (Sanford Dep. at 177.) But Sanford did not testify that the parts under the Tesla Model S program were in fact used in the Model X program or that Mata ever made any shipments under that program. (*See* Sanford Dep. at 177–85.) Accordingly, a reasonable jury could not find that Mata owes Plaintiffs commissions for the Tesla Model X program.

**IV.**

Mata's motion for summary judgment (Dkt. 41) is GRANTED IN PART and DENIED IN PART. As to Sanford only, Mata is GRANTED summary judgment on Sanford's claims for breach of contract (Count I), quantum meruit (Count II), unjust enrichment (Count III), and under Michigan's Sales Representatives' Commission Act (Count VI). As to both Sanford and Automotive Interior, Mata is GRANTED summary judgment on Count V to the extent that count asserts that Sanford and Automotive Interior are entitled to commissions for Sanford's work for Mata prior to January 2012 or Automotive Interior's work for Mata after April 6, 2013, i.e., as a matter of law, Plaintiffs are not entitled to commissions for (1) the Corvette-IP-panel program awarded to Mata on June 27, 2011, (2) the Dodge-DS-Ram-Longhorn-and-Signature-Edition-door-inserts program awarded on August 18, 2011, (3) the Dodge-DS-Ram-Longhorn-and-Signature-Edition-IP-inserts program awarded on November 11, 2011, (4) the Tesla-Model-S-IP-and-console-set program awarded on September 8, 2011, or (5) the Tesla-Model-X program (*see* Dkt. 41 at 12.) Mata's motion is DENIED in all other respects.[3]

SO ORDERED.

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Dated:  July 9, 2015

---

[3] To be clear, Mata is not entitled to summary judgment on the issue of whether commissions are owed for the life of the part on the following three programs: (1) the Corvette-seat-back program awarded on April 23, 2012, (2) the GM-steering-wheel-insert program awarded May 8, 2012, and (3) the Cadillac-gear-knob program awarded February 1, 2012.

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on July 9, 2015.

s/Jane Johnson
Case Manager to
Honorable Laurie J. Michelson